UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re:<br><br>INNATECH, LLC,<br><br>    Debtor.<br><br>Tax I.D. No. 38-3531005 | Chapter 11<br><br>Case No. 10-49380<br><br>Hon. Thomas J. Tucker |

**DECLARATION OF PHILIP NICHOLLS IN SUPPORT OF**
**CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

Philip Nicholls makes this declaration pursuant to 28 U.S.C. § 1746, and states:

1. I am the Chief Financial Officer of the above-captioned debtor, Innatech, LLC ("Innatech" or the "Debtor"), a Michigan limited liability company. I am authorized to submit this Declaration in support of the Debtor's chapter 11 petition and First Day Motions, as defined below and described herein.[1]

2. I am familiar with the Debtor's day-to-day operations, business affairs, and books and records. I have also reviewed the Debtor's First Day Motions and am familiar with the facts alleged and relief requested therein. Except as otherwise indicated, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtor's employees that report to me in the ordinary course of my responsibilities and, if called as a witness, would testify in accordance with the matters set forth herein.

---
[1] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Motion.

### A. The Bankruptcy Case

3. On March 23, 2010 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor intends to continue in possession of its property and the management of its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code and to promptly reorganize its affairs.

### B. The Debtor's Business and Equity Holders

4. Based in Rochester Hills, Michigan, Innatech is a leading manufacturer and designer of highly-engineered injection molded components and assemblies for sale to Tier I and II automotive suppliers and other customers outside of the automotive industry. Approximately 147 people are employed in the Debtor's business at three locations in Michigan, Ohio and Indiana.

5. Innatech is a member-managed limited liability company. Alan H. Elder, Trustee (5.54%), Mark O. Elder, Trustee (10.64%), Paul A. Elder, Trustee (2.13%), Todd N. Elder, Trustee (5.54%), Mark A. Harrington (2.13%), Invoak, LLC, a Michigan limited liability company ("<u>Invoak</u>") (15.00%), and Willard B. McCardell, Jr. (59.02%) are Innatech's members and, together, own 100% of the equity of Innatech. Invoak is the managing member of Innatech.

### C. Events Leading to the Filing of the Chapter 11 Case

6. Recent developments, including the general downturn in the economy as a whole and the domestic automotive market in particular, the increase in price of the Debtor's main raw material, plastic resin, and the Debtor's investment in and development of unique injection molding processes, among other reasons, have created severe liquidity constraints for the Debtor and placed the Debtor in default under its Existing Credit Agreement. As a result of such

defaults, and pursuant to Amendment No. 6 to the Loan and Security Agreement, the Existing Credit Agreement terminated on February 28, 2010, and the Debtor's lender, Bridge Healthcare Finance, LLC ("Bridge") ceased virtually all non-payroll related funding of the Debtor.

7. In response to the foregoing, the Debtor engaged Amherst Partners, LLC and Clark Hill PLC as financial and legal advisors, respectively, to investigate various workout options for the company. However, given its liquidity crisis and the termination of its funding, the Debtor ultimately determined that it had to file for protection under chapter 11 to restructure its business and preserve enterprise value.

**D.  Objectives of Chapter 11 Filing**

8. The Debtor, through this chapter 11 case, seeks to effectuate a financial restructuring and to reorganize as a going-concern, thereby preserving the Debtor's operations and value for the benefit of the Debtor's investors, creditors, on-going vendors, and other parties in interest.

**E.  First Day Motions and Orders**

9. In furtherance of these objectives, the Debtor expects to file a number of "first day" motions (the "First Day Motions"), each as discussed below, and respectfully requests that the Court enter the proposed orders granting the same. I have reviewed each of the First Day Motions and proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.

10. I believe that the relief sought in each of the First Day Motions and proposed orders (a) is vital to enable the Debtor to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to its business and (b) constitutes a critical element in achieving the Debtor's successful reorganization.

I. **First Day Motion Of The Debtor Pursuant To Sections 105(a), 361, 363, And 552 Of The Bankruptcy Code And Bankruptcy Rule 4001(b) For Entry Of (I) Interim And Final Orders (A) Authorizing Use Of Cash Collateral; And (B) Granting Adequate Protection; And (II) Order Scheduling A Final Hearing**

11. Innatech, as Borrower, is a party to a Loan and Security Agreement dated as of April 4, 2008 (as heretofore amended, supplemented or otherwise modified, the "Existing Credit Agreement") with Bridge. Willard McCardell, the Debtor's President, executed one or more guarantees in respect of Innatech's obligations under the Existing Credit Agreement. The Existing Credit Agreement provided for revolving loans to Innatech in an amount up to $8,000,000 (the "Revolver Loan"), and a term loan in an amount up to $5,500,000 (the "Term Loan").

12. The Revolver Loan and Term Loan are secured by first-priority security interests and liens (the "Pre-Petition Liens") in (a) the Debtor's accounts receivable and inventory and (b) the Debtor's machinery and equipment, respectively (collectively, the "Pre-Petition Collateral"), and all proceeds derived from the Pre-Petition Collateral, and are cross-collateralized with each other. The cash proceeds of the Debtor's accounts receivable subject to the Pre-Petition Liens are hereafter referred to as the "Cash Collateral."

13. As of the Petition Date, the outstanding balance of the Revolver Loan, including principal and interest, is approximately $3,561,183, and the outstanding balance of the Term Loan, including principal and interest, is approximately $2,954,209.

14. Based upon recent appraisals updated at or near the Petition Date, and the Debtor's books and records, I believe that the approximate value of Bridge's collateral is as follows:

| | | |
|---|---|---|
| A. | Eligible Accounts Receivable: | $3,262,487 |
| B. | Raw Material Inventory: | $400,000 |
| C. | Finished Goods Inventory: | $302,801 |
| D. | Machinery and Equipment: | $6,259,780 |
| | **Total** | $10,225,068 |

15. To the best of my information and belief, the Debtor's sales are constant or increasing and, therefore, with the exception of minor variances in the timing of collections, the level of the Debtor's post-petition accounts receivable and inventory will similarly remain stable or increase in value. A significant portion of the Debtor's machinery and equipment was purchased new approximately 4 years ago, has been very well maintained, and is adequately insured and otherwise protected against undue deterioration or depreciation.

16. The Debtor needs to fund critical expenses necessary to maintaining the Debtor's business and its going-concern value for the benefit of all creditors and parties in interest. Of immediate urgency is the need to fund the Debtor's next payroll in the approximate amount of $250,000 and to acquire critical amounts of production materials.

17. The Debtor proposes to use Cash Collateral for the payment of employee wages and salaries, payroll taxes, required inventory, utilities, and other general operating expenses as detailed in the Budget in the ordinary course of the Debtor's business, and for the payment of expenditures authorized by order of the Court, including, without limitation, the fees and expenses of professionals whose retention has been approved by the Court under sections 327,

328, and 330 of the Bankruptcy Code, and the fees of the U.S. Trustee and the Clerk of the Court.

18. The Debtor has prepared and delivered to Bridge an initial 15-day and 13-week budget which set forth, among other things, projected weekly cash receipts and disbursements for such period. I believe that for the 15-day period beginning on the Petition Date the Debtor needs to use Cash Collateral up to the amount of $1,285,000 to avoid immediate and irreparable harm.

19. I further believe that, to the extent the Pre-Petition Liens asserted by Bridge in Cash Collateral are valid, such liens and interests are adequately protected by means of a replacement lien in the Debtor's post-petition accounts receivable and inventory, and by Bridge's existing lien in the Debtor's machinery and equipment, and the equity cushion associated therewith.

20. In addition to replacement liens and the equity cushion inherent in the value of the Debtor's machinery and equipment, I believe the interim use of Cash Collateral will preserve the Debtor's ongoing ability to operate and otherwise avoid an immediate interruption in customer production, thereby further adequately protecting the liens and interests of Bridge. I believe that any interruption in customer production will necessarily result in (among other things detrimental to the Debtor's enterprise and Bridge's collateral) significant offsets to and, therefore, a significant reduction in the value of the accounts receivable.

21. I believe that without the use of Cash Collateral, the Debtor will be forced to terminate its operations and commence a forced liquidation of its assets, severely impacting the likely recovery to creditors.

6344669.6 23608/135258                         -6-

10-49380-tjt    Doc 4    Filed 03/23/10    Entered 03/23/10 19:02:43    Page 6 of 16

## II. First Day Motion Of The Debtor Pursuant To Section 521(a) Of The Bankruptcy Code And Bankruptcy Rules 1007 And 9006(b) Granting Extension Of Time For The Debtor To File Its Schedules And Statement Of Financial Affairs

22. The Debtor also requests an extension of time to file schedules and statements and relief from the United States Trustee's guideline requirement that the Debtor perform a physical inventory.

23. Based upon an initial analysis, the Debtor estimates that it has approximately 600 potential creditors. Given the size and complexity of the Debtor's operations, the short notice on which the decision to file this bankruptcy case was made, and the need to focus its efforts on obtaining authority to use cash collateral and other "first day" relief, the Debtor has not had the opportunity to gather the necessary information to prepare and file its Schedules and Statements. Although the Debtor will diligently gather and compile the necessary information, despite its best efforts and the assistance of proposed counsel, I do not believe that it will be able to complete this process appropriately and accurately within the 14-day period following the Petition Date as provided for in Bankruptcy Rule 1007(c).

24. Additionally, I submit that the inventory requirements of Section 7 of the Operating Guidelines are overly burdensome given the size of the Debtor's business and limited resources. I believe that conducting the physical inventory mandated by Section 7 of the Operating Guidelines would likely be disruptive to the Debtor's manufacturing operations, resulting in productivity and sales losses. Moreover, Bridge, the Debtor's prepetition lender and primary secured creditor, already has substantial information regarding these assets and has access to the Debtor's facilities to monitor their disposition. Due to the financial and operational burdens the Debtor would likely suffer by conducting a comprehensive inventory evaluation at

its various facilities at this time, and in light of Bridge's position, I believe that a waiver of the inventory requirements of Section 7 of the Operating Guidelines is appropriate.

### III. First Day Motion Of The Debtor Pursuant To Sections 105(a) And 366 Of The Bankruptcy Code For Entry Of An Order (A) Prohibiting Utility Companies From Altering, Refusing, Or Discontinuing Services; (B) Deeming Utility Companies Adequately Assured Of Payment For Postpetition Services; And (C) Establishing Procedures For Determining Requests For Additional Assurances

25. In the operation of its facilities, the Debtor incurs utility expenses for, among other things, electricity, gas, telephone service, water, and waste disposal in the ordinary course of business. The utility services received by the Debtor are originated and provided by service providers (collectively, the "<u>Utility Companies</u>"). To the best of my information and belief, the Debtor maintains approximately 16 accounts with the Utility Companies. The utility services are provided to the Debtor in several states.

26. The services of the Utility Companies are critical to the effective operation of the Debtor's business. Should one or more of the Utility Companies refuse or discontinue service even for a brief period, I believe the Debtor's operations would be severely disrupted. Such an interruption would adversely impact the Debtor's revenues, profits, and operations and significantly affect the Debtor's restructuring efforts to the detriment of its estate and creditors. I, therefore, believe that it is critical that utility services provided to the Debtor continue uninterrupted.

27. The Debtor fully intends to pay all postpetition obligations owed to the Utility Companies in a timely manner. Moreover, to the best of my information and belief, the Debtor will have sufficient cash available through the operation of the Debtor's business to pay such postpetition utility obligations as they become due.

28. Additionally, the Debtor proposes to provide all Utility Companies, within ten (10) business days of entry of an order approving this Motion, a deposit in an amount equal to the average cost to the Debtor of one-half of a month of service from such Utility Company. The average is based on figures for the twelve (12) months preceding the Petition Date, or for the prepetition period in which the Debtor utilized the services of such Utility Company in the ordinary course of business if less than 12 months. I believe the proposed deposits to be provided by the Debtor to the Utility Companies will bring them adequate security that they will be paid for continuing to deliver services to the Debtor.

29. Procedures are also proposed to permit any Utility Company to request additional assurances. Without the procedures proposed, the Debtor could be forced to address numerous requests by Utility Companies in a disorganized manner at a critical period in its reorganization efforts and during a time when its efforts could be more productively focused for the benefit of its creditors. Accordingly, implementation of these procedures is in the best interests of the debtor and its estate.

**IV. First Day Motion Of The Debtor Pursuant To Sections 105(a), 363, 364 And 503(B)(1) Of The Bankruptcy Code Authorizing (A) Continued Maintenance Of Existing Bank Accounts, (B) Continued Use Of Existing Business Forms And (C) Continued Use Of Existing Cash Management System**

30. The Debtor's business and financial affairs involve a high level of financial activity, requiring the collection, disbursement, and movement of funds regularly and rapidly through several bank accounts.

31. In the ordinary course of its business, the Debtor maintains three (3) bank accounts out of which it manages cash receipts and disbursements (the "Bank Accounts") and a

6344669.6 23608/135258                -9-

10-49380-tjt    Doc 4    Filed 03/23/10    Entered 03/23/10 19:02:43    Page 9 of 16

cash management system (the "Cash Management System"). The Bank Accounts are maintained at Harris Bank ("Harris") and Comerica Bank ("Comerica").

32. At Harris, the Debtor maintains a lockbox account (the "Lockbox Account") into which accounts receivable are deposited. In addition, one of the Bank Accounts is used exclusively as a disbursement account (the "Harris Disbursement Account") from which the Debtor pays payroll, insurance, accounts payable, employee benefits, and other obligations. The Debtor also has a revolving credit facility (the "Revolving Account") with Bridge.

33. The Debtor maintains an account at Comerica for receipts and disbursements (the "Comerica Account") related to Dynamic, a division of Innatech responsible for tooling production.

34. I believe that all of the Bank Accounts are in financially stable banking institutions with FDIC insurance and are part of the established Cash Management System that the Debtor needs to maintain in order to ensure the smooth and uninterrupted processing of collections and disbursements in the ordinary course.

35. I further believe that the Cash Management System utilized by the Debtor constitutes ordinary, usual and essential business practices that are similar to those used by other major automotive industry companies.

36. Innatech's Cash Management System is funded by daily advancements of funds from the Debtor's Revolving Account. All incoming funds and customer receipts of Innatech are deposited into the Lockbox Account or from the Comerica Account into the Revolving Account. Funds from the Lockbox Account are "swept" daily into the Revolving Account to pay down the Bridge revolving loan.

37. On a daily basis, funds from the Revolving Account are advanced to the Debtor and deposited directly into the Harris Disbursement Account pursuant to a borrowing base report. Similarly, on an as-needed basis, funds are wired from the Harris Disbursement Account into the Comerica Account. Together, the Harris Disbursement Account and the Comerica Account are used for payroll, insurance, accounts payable, employee benefits, and other obligations.

38. The Cash Management System is computerized. This allows the Debtor to centrally manage all of its cash flow needs and includes the necessary account controls to enable the Debtor, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.

39. In my opinion, the Cash Management System utilized by the Debtor provides essential benefits including the ability to (a) facilitate forecasting and reporting, (b) monitor collection and disbursement of funds, (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. I believe these controls are particularly important here, given the significant amount of cash that flows through the Debtor's Cash Management System.

40. Additionally, in the ordinary course of its business, the Debtor uses a multitude of checks and other business forms, including, but not limited to, letterhead, purchase orders, invoices, contracts, and checks.

41. I believe that requiring the Debtor to alter its use of Business Forms and Checks would cause enormous disruption in the Debtor's business and impair its efforts to reorganize. Moreover, I believe such actions would be expensive, unnecessary, and burdensome to the

Debtor's estates and would not confer any benefit upon those dealing with the Debtor. Consequently, I believe that maintenance of the existing Cash Management System and other banking and business practices is in the best interests of the Debtor, its creditors, and other parties-in-interest.

**V.     First Day Motion Of The Debtor Pursuant To Sections 105(a), 361, 363, 507(a), And 1107 Of The Bankruptcy Code For Entry Of An Order Authorizing The Debtor, *Inter Alia*, To Pay Prepetition Wages, Compensation, And Employee Benefits**

42.     The Debtor's Employees perform a variety of critical functions, including the continued manufacture of products, as well as performing many administrative, accounting, supervisory, management, and other tasks. The Employees' skills and their knowledge and understanding of the Debtor's infrastructure, operations, and customer relations are essential to maintaining the value of, and to the effective reorganization of, the Debtor's business. Without the continued services of the Employees, I do not believe that an effective reorganization of the Debtor will be possible.

43.     As of the Petition Date, the Debtor employs approximately 147 people in its business at three locations in Michigan, Ohio and Indiana, comprising both hourly wage earner personnel (the "Hourly Employees"), and salaried personnel (the "Salaried Employees") (the Hourly Employees and Salaried Employees, collectively, the "Employees"). Both Hourly Employees and Salaried Employees are paid bi-weekly. The aggregate gross bi-weekly payroll to all Employees is approximately $250,000. The Debtor also employs certain Employees through Manpower, an employment agency in Richmond, Indiana. To the best of my information and belief, I estimate that approximately $18,275 is owed to Manpower as of the Petition Date on account of employment services. The Debtor uses Data Management Payroll

Service ("DMPS") to administer its payroll. The monthly cost for payroll administration through DMPS is approximately $2,500 and is taken by DMPS out of the first payroll of the month. To the best of my information and belief, no Employees were owed in excess of $10,950 as of the Petition Date for prepetition wages or salaries.

44. The Debtor offers its eligible Employees other compensation in the form of vacation time, overtime pay, and paid holidays. These forms of compensation are usual, customary, and necessary if the Debtor is to retain qualified employees to operate its business. The Debtor provides eligible Employees vacation time (the "Vacation Time") based on the Employee's length of service to the company. Subject to supervisory approval, Employees may accumulate a maximum of five (5) days Vacation Time for carry over each year. To the best of my information and belief, I estimate that approximately $80,237 in the aggregate is owed to Hourly Employees for Vacation Time as of the Petition Date.

45. The Debtor routinely reimburses Employees for certain expenses incurred within the scope of their employment, including expenses for travel, meals, gas, company car repair, and phone (collectively, the "Business Expenses"). To the best of my information and belief, I estimate that approximately $52,334.31 is owed to Employees for Business Expenses as of the Petition Date; however, this estimate may not include certain incurred Business Expenses on account of which Employees have not submitted expense reports as of the Petition Date.

46. The Debtor provides a number of eligible Employees and their dependents with medical benefits pursuant to two (2) different medical plans (collectively, the "Medical Plans") through Blue Cross Blue Shield of Michigan. The Medical Plans are funded through contributions by participating Employees and by the Debtor. The total monthly cost of the

Medical Plans is approximately $60,977, with the Debtor paying approximately $53,003 of this amount and the eligible Employees paying approximately $7,974 of this amount through payroll deductions. To the best of my information and belief, the Debtor is current on its obligation under the Medical Plans as of the Petition Date.

47. In addition, the Debtor offers its eligible Employees the use of flexible spending accounts for various medical claims not otherwise covered by the Medical Plans.

48. The Debtor also offers its eligible Employees dental benefits (the "Dental Plan") through Activa. The Dental Plan is self-funded.

49. The Debtor also offers its eligible Employees vision benefits (the "Vision Plan") through Activa. The Vision Plan is self-funded.

50. The Debtor also offers its eligible Employees accidental death and dismemberment insurance, along with optional supplemental accidental death and dismemberment insurance, (the "AD&D Insurance") pursuant to a policy issued by Chubb. The total monthly cost of the AD&D Insurance to the Debtor is approximately $206.

51. The Debtor also offers its eligible Employees short-term disability insurance pursuant to a policy issued by Activa. The short-term disability insurance is self-funded.

52. The Debtor also offers eligible Employees life insurance, along with optional supplemental life insurance for self, spouse, and/or child, (the "Life Insurance") pursuant to a policy issued by Prudential. The Debtor also offers its eligible Salaried Employees long-term disability insurance pursuant to a policy issued by Prudential. The monthly cost to the Debtor of the Life Insurance and the long-term disability insurance is approximately $1,592. To the best of

6344669.6 23608/135258                -14-

10-49380-tjt    Doc 4    Filed 03/23/10    Entered 03/23/10 19:02:43    Page 14 of 16

my information and belief, as of the Petition Date, the Debtor owes Prudential approximately $7,040.97.

53. The Debtor also offers certain Employees a savings and retirement plan through which they can accumulate savings for their future. Specifically, eligible Employees each year may contribute a portion of their pre-tax compensation for investment in a 401(k) plan with ING Financial, which is managed by MBC Retirement Services, Inc., a third-party administrator. To the best of my information and belief, I estimate that approximately $6,250 is owed to MBC Retirement Services, Inc. as of the Petition Date in connection with the administration of the 401(k) Plan.

54. The Debtor provides workers' compensation benefits (the "Workers Compensation Benefits") to eligible Employees. The cost to the Debtor of the Workers Compensation Benefits is approximately $1,500 per month in Michigan, approximately $14,000 semi-annually in Ohio (with the next payment due in August), and approximately $35,000 per year in Indiana paid in nine (9) installments. To the best of my information and belief, I estimate that approximately $18,000 is past due as of the Petition Date in connection with the Workers Compensation Benefits.

55. The Debtor routinely withholds from Employee paychecks amounts that the Debtor is required to transmit to third parties. Examples of such withholding include social security, FICA, federal and state income tax, child support, and health care payments. To the best of my information and belief, such withheld funds, to the extent that they remain in the Debtor's possession, constitute moneys held in trust and therefore are not property of the

Debtor's bankruptcy estate. Thus, to the best of my information and belief, the Debtor has authority to direct such funds to the appropriate parties in the ordinary course of business.

56. If the Debtor does not obtain authority to pay all prepetition wages, compensation, and benefits, I believe the Debtor's estate will be immediately and irreparably harmed.

I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Date: 3/23/10

INNATECH, LLC

By: _____
Philip Nicholls, as its Chief Financial Officer